IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

KARYN NEIMAN,                          )          CASE NO. 1:12-CV-1645
                                       )
              Plaintiff,               )
                                       )
       v.                              )
                                       )          MAGISTRATE JUDGE McHARGH
                                       )
ROBERT REID, *et al.*,                 )
                                       )          **MEMORANDUM OPINION & ORDER**
                                       )
              Defendants.              )


       Plaintiff Karyn Neiman brings a claim for First Amendment retaliation pursuant to 42 U.S.C. 1983 against Defendants Robert Reid and Cuyahoga County ("Defendants").  Pending before the Court are Defendant Reid and Cuyahoga County's joint motion for summary judgment (Doc. No. 25), Plaintiff's response in opposition to the motion (Doc. No. 36), and Defendants' reply. (Doc. No. 45).

       In addition, Defendants have filed a motion to strike portions of Plaintiff's declaration offered in opposition to summary judgment (Doc. No. 43), and Defendant Reid has individually moved for summary judgment on the ground of qualified immunity. (Doc. No. 47).  Though the time for doing so has expired, Plaintiff has not filed an opposition to the motion to strike or to Reid's motion for summary judgment.

       For the reasons set forth below, Defendants' joint motion for summary judgment and motion to strike, as well as Defendant Reid's motion for summary judgment, are GRANTED.

1

# I.    FACTS

## A.  The Cuyahoga County Sheriff's Office

The following background information is uncontested.  In March 2007, Plaintiff was hired as a Budget Management Analyst in the Cuyahoga County Sheriff's Office. (Declaration of Karyn Neiman ("Neiman Dec.") at ¶ 3, Doc. No. 37-1). At the time, Gerald McFaul served as Cuyahoga County Sheriff.  Patricia Kresty was Sheriff McFaul's chief of staff and Plaintiff's supervisor.

On March 26, 2009, the Ohio Bureau of Criminal Investigation ("BCI") executed search warrants at the sheriff's administrative offices.  The warrants included electronic and paper records of Sheriff McFaul, Kresty, and other leaders in the sheriff's department.  Shortly after the search, McFaul advised the Cuyahoga County Board of Commissioners that he would be resigning effective April 1, 2009.  Frank Bova, police chief of the City of Warrensville Heights, was designated interim sheriff, pending appointment of a permanent replacement for McFaul.  On May 2, 2009, the Cuyahoga County Central Committee selected Robert Reid as the new Cuyahoga County Sheriff. (Declaration of Robert Reid ("Reid Dec.") at ¶ 3, Doc. No. 25-1).

A number of staff changes ensued within the sheriff's office after McFaul's resignation.  While Bova was interim sheriff, Kresty initiated her retirement. (Neiman Dec. at ¶ 12, 13).  As a result, Plaintiff reported directly to Sheriff Bova and later to Sheriff Reid.  Shortly after Reid was appointed sheriff, McFaul's personnel director, Grayce Lynch, initiated her retirement. (Reid Dec. at ¶ 5).  During Reid's first week as sheriff, he requested the resignations or retirements of Chief Deputy Burkhart, Deputy Inspector Havranek, and Deputy Captain Eakins, and all complied with his request. (*Id.* at ¶ 6).

Around June 2010, McFaul plead guilty to two felony counts of theft in office and one misdemeanor ethical violation in connection with his political fundraising efforts. (McFaul Sentencing Memorandum, Doc. No. 25-10).  No one else was indicted in connection with the McFaul investigation.

### B. Plaintiff's involvement with BCI's investigation and workplace conduct after McFaul's resignation

While serving as interim sheriff, Bova asked Plaintiff if she was aware of any financial irregularities within the department. (Neiman Dec. at ¶ 14).  Plaintiff advised him of missing funds from a transportation account, which former employee Joann Marino had managed. (*Id.* at ¶ 15).  Bova instructed Neiman to contact an investigator at BCI, and she did. (*Id.* at ¶ 17, 19).

From April 2009 through October 2009, BCI agents interviewed Neiman approximately six times, and Neiman often delivered documents during these meetings. (BCI Investigation Reports ("BCI Reports") at 2-24, Doc. No. 25-9).   On two additional occasions, Plaintiff dropped off records at BCI but was not interviewed. (*Id.*).

During Plaintiff's first interview with BCI on April 14, 2009, Plaintiff discussed problems reconciling the transportation account. (BCI Reports at 22-24).  Neiman also recounted issues regarding vendors used to provide supplies to the Cuyahoga County Jail, and her belief that there had been nepotism in hiring under Sheriff McFaul. (*Id.* at 23-24).  Plaintiff provided financial records for the jail's commissary bank accounts. (*Id.* at 20).

Neiman's next interview with BCI was on May 14, 2009. (*Id.* at 17).  She further discussed the transportation account managed by Marino and an audit that was conducted after Marino resigned. (*Id.*).  Plaintiff was interviewed again on May 22, 2009, at which time she answered questions about vendors holding larger contracts with the sheriff's office and the prison. (*Id.* at 16).

When Defendant Reid became sheriff in May 2009, Plaintiff was the highest-ranking fiscal employee in the sheriff's department. (Reid Dec. at ¶ 7).  Plaintiff testified that Reid did not hire a replacement for her former supervisor, Kresty, but instead assigned many of Kresty's duties to her through the summer and fall of 2009. (Neiman Dec. at ¶ 24, 25).  She did not receive a change in title or pay. (*Id.* at ¶ 26).  Plaintiff had supervisory responsibility over three employees: Donna Kaleal, Rae McKinnon, and Tarah Grossman. (*Id.*).

In May 2009, when Reid started his tenure as sheriff, Neiman began emailing him to obtain permission to meet with BCI investigators. (Deposition of Karyn Neiman ("Neiman Dep.") at 66:24-67:7, Doc. No. 25-11).  More specifically, Neiman asked Sheriff Reid to sign off on every meeting she had with BCI agents on a scheduled work date during scheduled work hours. (*Id.* at 67:8-22, 86:8-10).  She likewise notified Sheriff Reid regarding record requests from BCI before providing the agency with the documents. (*Id.* at 130).  Plaintiff convened with BCI investigators on one occasion outside of work hours. (*Id.* at 68).   This meeting occurred at some point in October of 2009. (*Id.*).

On June 1, 2009, Plaintiff dropped off documents concerning vendors to BCI. (BCI Reports at 15).  She also provided the names of employees working at the jail commissary and the shipping dock. (*Id.*).  A BCI office sign-in log indicates that Plaintiff visited on July 28, 2009, for an interview, but the agency did not provide an investigative report correlating to the visit. (BCI Investigations Sign-In Log at 15, Doc. No. 36-16).

Sheriff Reid testified that by July 2009, he had become aware, through direct observation of Plaintiff's conduct and information from staff members, that Plaintiff employed bullying, intimidation, and a demeaning manner when performing her job duties. (Reid Dec. at ¶ 8).  Reid met with Plaintiff to discuss his concerns about her performance on multiple occasions from July

4

through October 2009. (*Id.* at ¶ 9).  For example, Sheriff Reid met with Neiman in July 2009 and praised her commitment to the budget and passion to save money. (Reid Dec. Exhibit A, Memo to Neiman Personnel File ("Reid Memo") at 1-2, Doc. No. 25-2).  However, Reid also explained that Plaintiff's style in the workplace alienated colleagues and subordinates, and she needed to adopt a more professional and team-oriented approach. (*Id.*).  The sheriff stressed that workplace harmony was as important as fulfilling fiscal responsibilities. (*Id.*).  Reid characterized Neiman's reaction to the discussion as defensive. (*Id.*).

Plaintiff also describes meeting with Reid.  For example, Plaintiff claims that on July 17, 2009, Sheriff Reid told her that she "alienated people," "people dislike [her]," and she "disrupted the harmony of the office." (Neiman Dec. at ¶ 28).  Neiman alleges this was the first time she had heard complaints about her demeanor in the workplace. (*Id.*).  She claims that Reid denied her request to delegate tasks to other staff members. (*Id.*).  In a later July 2009 conference, Neiman alleges that Sheriff Reid referred to her as a "mushroom face" and "a tool," and accused her of "hibernating in her office." (*Id.* at ¶ 31).  According to Neiman, Reid advised that if she could not be happy in her job, she should find another, and that he had fired a staff member in the past for being unhappy and would do so again. (*Id.*).  At some point, Sheriff Reid called Neiman "the grim reaper," though Reid indicated that he did so in a joking, rather than demeaning, manner.[1]  (Deposition of Robert Reid ("Reid Dep.") at 122-23, Doc. No. 37-2).

In August 2009, Sheriff Reid received an email complaint from Susanne Renda, a federal treasury employee, who expressed her concern regarding the "terrible demeanor" she

---

[1] Reid testified that he said to Neiman, "When you come in [my office] you're like the grim reaper, you always got some bad news for me." (Reid Dep. at 122-23).

experienced with Neiman. (Reid Memo at 2).  Renda explained that Neiman had yelled at her over the phone regarding a bill. (*Id.*).[2]

The following month, September 2009, Sheriff Reid learned that Neiman had yelled at the officer manager of a dentist who provided services to county inmates. (*Id.*).  The manager sent a letter to the sheriff's department in which she described Neiman as "deliberately antagonistic and argumentative" as well as "uncooperative, rude, and unprofessional." (Reid Dec. Exhibit B at 1, Doc. No. 25-3).  The dentist refused to provide services if required to work with Neiman in the future. (*Id.*).

On September 15, 2009, Sheriff Reid met with Plaintiff's subordinates, McKinnon, Kaleal, and Grossman, upon their request.[3] (Reid Memo at 2).  The employees indicated that Plaintiff created a hostile environment in the workplace through her refusal to communicate, demeaning tone, and unapproachable manner. (*Id.*).  Kaleal and McKinnon explained they were ill on Sundays at the prospect of returning to work on Monday with Neiman. (*Id.* at 3).  Reid asked the employees to put their concerns in writing. (*Id.*).

In a memorandum, Kaleal described Neiman as abrasive, harsh, and condescending. (Reid Dec. Exhibit C at 2-5, Doc. No. 25-3).  She provided examples of times when she alleged Plaintiff was negative or hostile toward employees and outside contractors since November 2007. (*Id.*).  A number of these incidents occurred after May 2009. (*Id.*).  McKinnon wrote that during the two years she worked under Neiman, she had been "subject to her many moods and caustic disposition." (Reid Dec. Exhibit F at 8, Doc. No. 25-3).  On numerous occasions,

---

[2] The complaint from Renda is also described in the Final Investigation Report of the Board of County Commissioners Office of Human Resources and the Report of Plaintiff's Disciplinary Hearing. (Reid Dec. Exhibit G at 10, 17, Doc. No. 25-7).
[3] At this point in time, Grossman had been transferred to the position of assistant to the employee relations specialist, but had an office next to Neiman. (Reid Memo at 2).  Also present at the meeting were personnel manager Rose Gheen and employee relations specialist Christopher Russ. (*Id.*).

McKinnon witnessed Plaintiff berating other county employees and outside vendors. (*Id.*). McKinnon had called vendors to apologize for Plaintiff's conduct. (*Id.*).  Grossman had also watched Neiman yell a printing vendor after a misunderstanding. (Reid Dec. Exhibit E at 7, Doc. No. 25-3).  Grossman explained that since her promotion out of the fiscal division, Neiman treated her with a complete lack of respect. (*Id.*).

Neiman met with the BCI on October 5, 2009, and discussed why the sheriff's office used supply companies to purchase products for the jail. (BCI Reports at 4).  Plaintiff provided an email from an employee of the Office of Procurement and Diversity which described a certain distributor having "favored nation status." (*Id.*).  At some point during the interview, Plaintiff started crying. (*Id.* at 5).  She described Reid's name-calling, his advisement that she should look for another job, and a comment he had made that she cared too much about the budget. (*Id.*).

On October 6, 2009, Plaintiff met with BCI and reported that she had found a communication system for the jail at a much lower price than that submitted by the vendor typically used to supply the county's communications needs. (*Id.* at 3).  She recommended that BCI investigate the company that supplied uniforms for the sheriff's department, which had been recommended by McFaul. (*Id.*).

Toward the end of October 2009, Sheriff Reid called BCI to inquire if three "appraisers" were cooperating with the agency's investigation. (BCI Reports at 6).  BCI agent Clar indicated that the appraisers had retained counsel. (*Id.*).  Sheriff Reid informed the agent that he planned to fire the appraisers because he felt that they "were less than cooperative with the BCI in the investigation, given their decision to retain counsel." (*Id.*).  Agent Clar questioned why the appraisers were being advised that they did not cooperate if they were assisting BCI through counsel. (*Id.* at 6).  Reid indicated that the other appraisers had come to BCI and agreed to be

interviewed, while the three that did not retained counsel. (*Id.* at 7).  Reid also told Agent Clar that he was upset at the local newspaper for reporting that he had fired the appraisers, as they were not employees. (*Id.*).

On October 21, 2009, Kaleal wrote a memo to Sheriff Reid stating that Neiman was speaking to her rarely, and when Neiman did so, it was in a hostile manner. (Reid Dec. Exhibit D at 6, Doc. No. 25-3).  Plaintiff would not take Kaleal's phone calls or open emails from Kaleal and other subordinates. (*Id.*).  Kaleal explained that Neiman's unresponsiveness prevented her from doing her job. (*Id.*).

On October 23, 2009, Sheriff Reid requested that Plaintiff attend anger management classes through the employee assistance program. (Reid Memo at 3; Neiman Dec. at ¶ 43). According to Plaintiff, Reid stated he recommended the program only so that he would "feel good about" terminating her employment. (Neiman. Dec. at ¶ 43).

On October 26, 2009, Plaintiff informed BCI agent O'Connor that Sheriff Reid had been "extremely abusive to her over several petty issues" on October 23. (BCI Reports at 2).  Neiman told investigators that she planned to contact her attorney and file for stress disability because she could no longer go to work. (*Id.*).  This is the last BCI report describing a meeting between Neiman and the agency.

During November and December of 2009, Plaintiff took a leave of absence under the Family Medical Leave Act ("FMLA") from her position. (Neiman Dec. at ¶ 51-53).  Neiman resumed work on January 4, 2010, working four hours per day, and increased her hours gradually until reaching full-time status. (Reid Dec. at ¶ 12; Neiman Dec. at ¶ 53).  According to Reid, Plaintiff's attitude and manner of expressing herself toward him, her subordinates, and other staff members remained hostile upon her return. (Reid Dec. at ¶ 12).

8

During Plaintiff's absence, Kaleal was offered the opportunity to fill in for Plaintiff after McKinnon, who was the more senior employee, turned down the position. (Deposition of Donna Kaleal ("Kaleal Dep.") at 17:20-25, Doc. No. 37-3).  A number of Plaintiff's work duties were assigned to Kaleal. (Neiman Dec. at ¶ 53).  Neiman highlights that Kaleal was in a romantic relationship with Lieutenant Donald Michalosky, which began in July 2008, and resulted in the couple becoming engaged sometime thereafter. (Kaleal Dep. at 22; Neiman Dec. at ¶ 71). Plaintiff testified that when Reid became sheriff, he announced that he would rely on the leadership and experience of Michalosky. (Neiman Dec. at ¶ 22).

On March 29, 2010, Kaleal informed Sheriff Reid that Virginia Parks, an official from the State of Ohio Office of Criminal Justice, refused to work with Neiman, who had been argumentative with Parks over a grant. (Reid Dec. Exhibit G, Human Resources Final Investigation Report ("Human Resources Report") at 18, 31, Doc. No. 25-4).  Later that month, Kaleal sent Reid two reports alleging that Neiman had mishandled certain transportation expenses and bulletproof vest ("BPV") grant funds. (*Id.* at 29, 30).  Kaleal explained that she went directly to Reid with these issues, rather than inform Neiman first, because she felt it necessary to bring the matters to Reid's attention. (Kaleal Dep. at 38-39).

Neiman took medical leave again at the end of March 2010. (Human Resources Report at 17).  She returned to work around May 3, 2010. (*Id.*).

Around May 2010, Sheriff Reid requested that the Cuyahoga County Office of Human Resources investigate Neiman's conduct and provide advice with respect to addressing Plaintiff's behavior as a disciplinary issue. (Reid Dec. at ¶ 13).  On May 25, 2010, Matthew Hawes, employee relations manager in the Office of Human Resources, sent Sheriff Reid a "Final Investigation Report." (*Id.*).  The report concluded that Neiman had committed a number

of disciplinary violations. (Human Resources Report at 22).  These included issues related to the BPV grant accounts, the transportation account, and Neiman's pattern of unprofessional behavior toward subordinate employees and entities that did business with the sheriff's department. (*Id.*).

Based on the human resources investigation report, Sheriff Reid called a disciplinary hearing, giving Neiman the opportunity to respond to the allegations of misconduct. (Reid. Dec. at ¶ 14).  Reid designated chief deputy Tim Oleksiak, and employee relations administrator Christopher Russ, to serve as hearing administrators and issue a report. (*Id.* at ¶ 15).  The hearing was held on June 10, 2010, and Plaintiff was represented by counsel.  The hearing administrators concluded that Neiman had committed several rule violations, generally in line with the findings in the human resources report. (Reid Dec. Exhibit G, Report of Disciplinary Hearing at 9-15, Doc. No. 25-4).

Following the hearing, Sheriff Reid concluded that Neiman should be removed from her position in the sheriff's office. (Reid Dec. at ¶ 16).  In making the decision, the sheriff testified that he took a number of factors into account, including the human resources report, the disciplinary hearing report, his knowledge of Plaintiff's manner of conducting herself over the preceding year, and attempts made to counsel her. (*Id.*).  Plaintiff was terminated effective June 24, 2010. (Reid. Dec. Exhibit G, Order of Removal at 1, Doc. No. 25-4).

## II.       SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It can discharge this burden in two ways: by producing evidence to indicate there is no genuine issue of material fact, or by demonstrating

that the nonmoving party fails to show sufficient evidence to establish the existence of an element essential to that party's case. *Id.*

If the moving party has met its burden, the nonmoving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (*citing* Rule 56 and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  In other words, the party opposing the motion "must show she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (emphasis in original).  The trial court does not have "the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir.1988)).

The existence of a mere scintilla of evidence in support of the nonmoving party's position will not defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).  There must be evidence on which a jury could reasonably find for the nonmoving party. *Id.*  Summary judgment shall be awarded "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317.

When reviewing summary judgment motions, a court must view the evidence, and the reasonable inferences that can be drawn from such, in a light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.  A court does not weigh the evidence or render credibility

11

determinations. *Joostberns v. U. Parcel Servs., Inc.*, 166 F. App'x 783, 787 (6th Cir. 2006) (*citing Anderson*, 477 U.S. at 249).

## III.    LAW & ANALYSIS

### A.  Defendants' motion to strike

Defendants have moved to strike[4] certain portions of Neiman's Declaration, which she submits in support of her opposition to summary judgment. (Doc. Nos. 43, 37-1).  Plaintiff has not filed an opposition to the motion to strike.

In order to be considered by the Court on a motion for summary judgment, an affidavit or declaration must satisfy three formal requirements: (1) it "must be made on personal knowledge"; (2) it must "set out facts that would be admissible in evidence"; and (3) it must "show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. Pro. 56(c)(4).  When resolving objections to affidavits or declarations offered in opposition to summary judgment, the Court may reject portions that do not satisfy the requirements of Rule 56(c)(4). *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009) (holding that the district court abused its discretion by striking the entire affidavit, rather than only the inadmissible portions).

Courts cannot consider inadmissible hearsay evidence in deciding whether or not to grant a motion for summary judgment. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009);

---

[4] Although Defendants call their motion, "a motion to strike," such a motion applies only to pleadings. Fed. R. Civ. P. 12(f).  Since the 2010 amendment to the Federal Rules, a motion to strike is technically not available to motions for summary judgment, rather the presented evidence may simply be disregarded on summary judgment. *See Adams v. Valega's Prof. Home Cleaning, Inc.*, No. 1:12-CV-644, 2012 WL 5386028, at *2 (N.D. Ohio Nov. 2, 2012) (collecting cases) (*citing* 5C Wright & Miller, Federal Practice and Procedure § 1380).  However, case law since the amendments uses the terms "strike" and "disregard" interchangeably. *Loadman Grp., L.L.C. v. Banco Popular N. Am.*, No. 4:10-CV-1759, 2013 WL 1154528, at *1 (N.D. Ohio Mar. 19, 2013).  The Court treats Defendants' motion to strike as Rule 56 objections to the admissibility of the portions of the declaration at issue.

*Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 480-81 (6th Cir. 2008). A statement is hearsay if it is made by a person other than the declarant and is offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). The party arguing for the admission of the evidence bears the burden of proving that the statement fits squarely within an exception to the hearsay rule. *United States v. Arnold*, 486 F.3d 177, 206 (6th Cir. 2007) (*quoting United States v. Kendrick*, 853 F.2d 492, 496 n. 3 (6th Cir. 1988)). Here, that party is Neiman. Where there are multiple layers of hearsay, the proponent must demonstrate that each layer falls under a hearsay exception, or is otherwise admissible. *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

In the present case, Defendants raise hearsay objections to a number of out-of-court statements that Plaintiff testifies were made by her former supervisor, Patricia Kresty, and BCI agent William O'Connor. More specifically, Defendants point to portions of paragraphs 5, 10, 42, 44, 47, and 48 of Neiman's declaration. (Doc. No. 37-1).

The statements Defendants highlight rely on hearsay, and in some instances double hearsay. For example, in paragraph 42, Plaintiff testified: "Mr. O'Connor told me that he had just had an argument with Sheriff Reid about the appraisers that Sheriff Reid had just fired, all of whom were cooperating with the BCI investigation." (*Id.*). Neiman's recitation of O'Connor's statements to her is classic hearsay. O'Connor could testify about his statement in his own affidavit or declaration, but he has not done so, despite Plaintiff's opportunity to conduct discovery.

The following statements made by Neiman in her declaration also constitute hearsay:

> Paragraph 5: "I was informed that the correction officer (C/O) that had been in charge of ordering the food and inventory control had died suddenly several

weeks prior to my starting.  My boss, Patricia Kresty (Chief of Staff), explained that the previous fiscal person had suspected something was going on with the food but ran into interference when she tried to look into it."

Paragraph 10: "I was later told by Pat Kresty that the Sheriff had agreed to drop the charges in exchange for Joann Marino dropping her sexual discrimination suit."

Paragraph 44:  "In November 2009, Bill O'Connor called to inform me that indictments would soon be issued for various former and current CCSO employees and that he was afraid that things were going to 'get tough' for me."

Paragraph 47: "Agent O'Connor . . . stat[ed] that the dates I had altercations with Sheriff Reid were also within a day or so of the dates that they had communications with Sheriff Reid regarding their investigation including my involvement."

Paragraph 48:  "Agent O'Connor stated to me that I should 'get an attorney.' "

Plaintiff has not come forward with a rationale for why these statements would be subject to an exception or exclusion.  As a result, she has not carried her burden of proving that the statements are competent summary judgment evidence, and the Court cannot consider them in evaluating the merits of summary judgment.

### B.  Plaintiff's theory of retaliation

As an initial matter, Defendants argue that Plaintiff has set forth in her opposition to the motion for summary judgment a theory that was not plead in her complaint.  Generally, courts will not consider claims that were not properly raised in a complaint or amendment to the complaint. *Vaughn v. City of Lebanon*, 18 F. App'x 252, 272 (6th Cir. 2001) (citing cases); *Marzuola v. Cont'l Tire N. Am.*, No. 5:05-CV-2339, 2006 WL 2345529, at *3 (N.D. Ohio Aug. 11, 2006) aff'd, 243 F. App'x 956 (6th Cir. 2007) ("It is well-established that a plaintiff cannot argue new legal theories in opposition to a defendant's motion for summary judgment.").

Defendants assert that in her complaint, Neiman bases her First Amendment claim on the theory that Reid retaliated against her participation in the BCI investigation because of his

14

allegiance to former sheriff McFaul.  The complaint reads: "Plaintiff Neiman alleges that her termination from employment was due to her participation in the criminal investigation into McFaul's activities." (Doc. No. 1 at ¶ 1).  She later claims: "Defendant Reid and former Sheriff Gerald McFaul are members of the same political party and associated with each other throughout the term of McFaul's employment." (*Id.* at ¶ 6).  Defendants are correct in that, at this juncture, Plaintiff has come forward with no evidence to support a theory that Reid took action against her exercise of First Amendment rights on behalf of McFaul.

In her opposition to the motion for summary judgment, Plaintiff argues that Sheriff Reid terminated her due to her participation in the BCI investigation, which she characterizes as an investigation of McFaul's activities as well as an on-going examination of the sheriff's office. (Plaintiff's Brief at 17, 19).  Though poorly structured, the complaint arguably gives rise to a broader theory that Defendant Reid terminated Neiman due to her participation with the BCI investigation in general.  Even so, Plaintiff has failed to present sufficient evidence to create a genuine issue of material fact such that dismissal of her First Amendment claim is appropriate.

### C.  First Amendment retaliation claim

A burden-shifting framework applies to claims of First Amendment free speech employment retaliation filed under 42 U.S.C. § 1983, which requires the following:

> A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.  If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294-95 (6th Cir. 2012) (internal citations and quotation marks omitted); *see also Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 (6th Cir. 2010).

### 1.  Whether Plaintiff engaged in constitutionally protected speech

There is no dispute that Neiman's termination constituted an adverse employment action. However, Defendants maintain that Plaintiff did not engage in constitutionally protected speech, because she spoke with BCI pursuant to her duties as an employee.

As a government employee, for her speech to receive First Amendment protection, Neiman must show that (1) the speech was made as a citizen and not made "pursuant to" the duties of her employment; (2) the speech involved a "matter of public concern;" and (3) the state employer's interest as an employer, in promoting the efficiency of the public services it performs, does not outweigh her desire to contribute to public debate like any other citizen. *Evans-Marshall*, 624 F.3d at 337-38 (*citing Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Education*, 391 U.S. 563 (1968); and *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Whether speech is constitutionally protected is a purely legal question for the Court to decide. *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350-51 (6th Cir. 2010) (citations omitted).

In *Garcetti*, the Supreme Court elaborated on the first prong of the above test.  The Court considered whether Ceballos, a calendar deputy for a district attorney, spoke as a citizen when he made statements in a memo to his supervisor recommending dismissal of a case because an affidavit that had been used to obtain a search warrant contained, what he believed to be, misrepresentations. *Garcetti*, 547 U.S. at 414-15.   The Court concluded that the speech was not

16

constitutionally protected because the plaintiff made his statements pursuant to his duties as a deputy. It explained that

> the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.
>
> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* at 421-22. The Court did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. However, it stated that "the proper inquiry is a practical one" and that "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the employee's professional duties for First Amendment purposes." *Id.* at 424-25.

In *Lane*, the Supreme Court recently clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). Lane was an administrator at a community college, who learned that the school was paying an employee for a job that she did not perform. *Id.* at 2375. Lane reported this discovery to the college president and was subsequently subpoenaed to testify before a federal grand jury and at

17

trial during the criminal prosecution of the employee. *Id.*  Thereafter, Lane was terminated under the guise of an employee layoff. *Id.* at 2376.

The *Lane* Court held that where public sector employees testify truthfully under oath during a judicial proceeding, pursuant to subpoena, they cannot be subject to adverse employment actions, if testifying is outside of the employees' ordinary job duties. *Id.* at 2378-79. This is true even if the speech at issue concerns information learned during the course of employment. *Id.*  The Court explained that the Eleventh Circuit had read *Garcetti* too broadly when it reasoned that, "because Lane learned of the subject matter of his testimony in the course of his employment . . . *Garcetti* requires that his testimony be treated as the speech of an employee." *Id.* at 2379.  According to the Court, the term "official responsibilities," as applied in *Garcetti*, involves the responsibilities an employee undertook when he "went to work and performed the tasks he was paid to perform." *Id.*

 The circumstances surrounding Neiman's speech are distinguishable from those in *Lane* as Neiman was neither subpoenaed nor did she testify under oath.  Even so, it is a close question whether Neiman was speaking in her capacity as a public employee.  The parties do not make clear the dynamic between Neiman's fiscal responsibilities in the sheriff's office and her role in the BCI investigation.  For the purposes of this analysis, the Court concludes that Neiman's speech was not independent of her employment.  Even if Neiman were speaking as a citizen, her retaliation claim nonetheless fails as Plaintiff has not established other elements of a *prima facie* case.

In determining whether speech owes its existence to a public employee's professional responsibilities, the Sixth Circuit has identified a number of factors for courts to consider, including, the impetus for the speech, the setting of the speech, the speech's audience, and its

general subject matter. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007).  The Sixth Circuit has also explained that the pursuant-to-official-duties rule applies to *ad hoc* or *de facto* duties not appearing in any written job description, as long as the speech "owes its existence to [the speaker's] professional responsibilities." *Id.* at 544 (*quoting Garcetti*, 547 U.S. at 421).

In *Weisbarth* the Sixth Circuit concluded that a park ranger's speech with an outside consultant, whom the ranger department had engaged to assess morale and performance within the department, was made pursuant to her official duties, even though giving the interview was an "ad hoc or *de facto* duty." *Id.* at 543-47.  Although speaking with the investigator was not part of the ranger's job description nor was the investigator someone in plaintiff's chain of command, her speech nevertheless owed its existence to her professional responsibilities. *Id.* at 544 (*quoting Garcetti*, 547 U.S. at 411).  The court noted that it may be "illogical or unfair" to ask an employee to speak and then punish them for speaking, but "the relevant question is whether the firing violated her free-speech rights under the First Amendment." *Id.* at 545.

Even though Neiman's speech was not set out in her job description, the circumstances suggest that it was still within the scope of her job duties.  Plaintiff spoke to BCI due to Bova's directive, rather than her own independent initiative or by virtue of her concern as a citizen. (Neiman Dec. at ¶ 14-17).  Following Bova's instruction, Sheriff Reid approved and allowed Neiman's cooperation to continue on company time. (Neiman Dep. at 66-67, 86).  Although the sheriff's department did not commission the BCI investigation like the employer in *Weisbarth*, a government employer, whose integrity is at issue, may reasonably direct, and thereafter expect, its employees to cooperate with an outside investigation as part of their employment. Particularly with regard to employees like Neiman, who stand in managerial positions.

19

Notably, Neiman met with BCI during work hours on all but one occasion. (Neiman Dep. at 68). Though Neiman argues that she "had to work extra time to make up for lost hours on her regular job," she does not contend that she was not compensated for efforts made in pursuit of providing BCI with information. Defendants submit Neiman's attendance records from the period at issue. (Doc. No. 25-6). The records do not set out Neiman's hourly compensation, such that the Court can conclusively ascertain whether Plaintiff was paid for her time at BCI. However, they do indicate that Plaintiff worked overtime on various days when she visited BCI, which suggests that Plaintiff was paid for a full day of work, including time with the agency, as well as for any additional time she was in the office. (*Id.*). Neiman has not provided evidence to the contrary.

In sum, Plaintiff's cooperation with law enforcement, originally ordered by her employer, and then approved and allowed to continue on company time by Defendant Reid, was speech pursuant to her official duties. Accordingly, the Court need not reach the remaining two prongs of the protected activity analysis.

### 2. Whether Plaintiff can demonstrate a causal connection

Regardless of the constitutional status of her speech, Neiman also fails to provide sufficient evidence of a causal connection between her speech and subsequent termination. To establish a *prima facie* case of retaliation, Plaintiff must further show that the exercise of her First Amendment rights was a "substantial or motivating factor" in Defendants' decision to fire her. *See Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010). A plaintiff "must point to specific, nonconclusory allegations reasonably linking [her] speech to employer discipline.' " *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (*quoting Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). The Sixth Circuit has interpreted

"motivating factor" to mean the but-for cause, "without which the action being challenged simply would not have been taken." *Id.* (*quoting Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)).

"A causal link can be shown through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action that may create an inference of causation." *Eckerman*, 636 F.3d at 209. If a causal connection is to be established through circumstantial evidence, the court may consider incidents of misconduct that do not rise to the level of an adverse employment action if they "show a pattern of mistreatment on the job based on the plaintiff's protected activities." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 305 (6th Cir. 2012).

Generally, a defendant's motivation for taking adverse action against the plaintiff is a matter to be resolved by a jury. *Id.* at 308. But a "court may nevertheless grant summary judgment on the issue of causation when warranted." *Bailey v. Floyd County Board of Education*, 106 F.3d 135, 144 (6th Cir. 1997). A plaintiff must show proof of a specific link between the speech and the decision to dismiss. *Id.*

Here, there is no evidence of direct retaliation. In regard to temporal proximity, roughly nine months transpired between Plaintiff's allegedly protected speech—her last meeting with BCI in October 2009—and her termination in June 2010. Under precedent in this jurisdiction, Neiman's termination was not sufficiently proximate in time to the adverse employment action to support an inference of wrongful retaliation. The Sixth Circuit has generally determined that temporal proximity, at least beyond six months, absent some further indicia of retaliation, cannot be used to infer causation. *Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) (lag time of more than six months does not permit strong causal inference because intervening events weaken the

21

relationship and it is reasonable to expect that the plaintiff had the opportunity to identify other circumstantial evidence to support causation); *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (two to five months insufficient); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (four months was insufficient to support an inference of retaliation); *see also Akers v. Cnty. of Bell*, 498 F. App'x 483, 487 (6th Cir. 2012) ("[T]he more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement [her] claim with other evidence of retaliatory conduct to establish causality.").

Neiman fails to identify additional circumstantial evidence to establish a retaliatory motive on Reid's part.  Plaintiff's theory of retaliation, though not clearly articulated in her poorly constructed opposition, appears to be that Reid retaliated against individuals cooperating with BCI's investigation, which she was central to, due to his higher political aspirations. (*Id.* at 19).  Plaintiff argues that it was undisputed that in 2009, Reid was planning to campaign for sheriff. (*Id.* at 5, 6).  Because the BCI investigation continued after Reid took office, she asserts that a jury could conclude that the inquiry was likely to focus on him. (Plaintiff's Brief at 4).

There are a number of issues with Neiman's argument.  To begin, Plaintiff provides no evidence to support the allegation that Defendant Reid had political aspirations.  Likewise, Plaintiff does not point to evidence from which a jury could conclude that Reid believed the BCI investigation would place him in some type of jeopardy.  Although Neiman alludes that the investigation, and her participation in it, were somehow a threat to Reid, she does not bolster this allegation with sufficient evidence from the record.

Beyond these allegations, Plaintiff's attempts to demonstrate that Reid had a retaliatory motive for her termination fail.  To begin, Neiman claims that Defendant Reid fired or "went after virtually everyone who was cooperating with BCI." (Plaintiff's Brief at 17, 19).  However,

Neiman does not even identify who the "everyone" she refers to encompasses.  The record indicates that when Reid took over for Bova, personnel director Lynch initiated her retirement without any action on Reid's part. (Reid Dec. at ¶ 5).  At the start of his tenure, Reid requested that three of McFaul's former staff members resign, but Plaintiff does not substantiate her claim that Reid's request was motivated by the employees' participation in the investigation. (*Id.* at ¶ 6).  In fact, it is unclear whether these employees even collaborated with BCI prior to their resignations.  Plaintiff has submitted to the Court a BCI investigation sign-in log, but has not demonstrated that Reid terminated any sheriff's office employee listed therein because of their involvement in the investigation. (BCI Investigations Sign-In Log, Doc. No. 36-16).

Plaintiff also maintains that Defendant Reid fired a number of appraisers because they retained counsel in association with the BCI investigation. (Plaintiff's Brief at 17).  Reid indicated to BCI that he planned to cut ties with three appraisers because he felt their decisions to retain counsel made them less than cooperative with BCI, despite BCI's indication that it was working through the appraisers' attorneys. (BCI Reports at 6-7).  While Defendant Reid's logic is curious, it is not sufficient to create a material dispute with regard to Neiman's termination. Without additional evidence showing that Reid was in some way opposed to the investigation, or Neiman's work with it, Reid's actions toward the appraisers does no more than create speculation as to his intent. Reid was aware of, and signed-off on, all of Neiman's meetings with BCI and her provision of documents to the agency.  Plaintiff does not demonstrate that Reid otherwise prohibited or restricted her, or any of the various sheriff's office employees listed on the BCI sign-in log, from collaborating with the agency.  Nor does Neiman show that Reid even spoke to her about BCI, aside from providing his approval for her requests to visit the agency.

In the fact section of her brief, Plaintiff recounts a number of actions that she alleges Reid took towards her, such as name-calling or assigning her additional work duties, during the time that she was working with BCI and thereafter.  Though not expressly articulated in her opposition, reading the facts in the light most favorable to Plaintiff, she seemingly asserts that a jury could conclude that any action Reid took toward her was in retaliation for her participation. Even accepting as true Neiman's testimony that Reid treated her inappropriately, she has not sufficiently demonstrated that Reid's actions were motivated by her speech.

The remainder of the argument section of Neiman's brief on the issue of causation is short on cogent discussion of the evidentiary record.  It appears that Plaintiff asks the Court to draw inferences from assertions she makes without providing analysis or support for her conclusions.   For example, Plaintiff points out that Kaleal continued marriage plans to Michaloksy, whom Plaintiff characterizes as Reid's "right-hand man," allegedly in violation of the department's no nepotism policy. (Plaintiff's Brief at 12-13, 18, 19).  Yet, regardless of the propriety of Kaleal's relationship with Michalosky, Plaintiff does not show how it had any bearing on Reid's decision to terminate her because of her speech.  Neiman's arguments lack logic or are largely grounded in unsupported conclusions, mere suspicions, or broad assumptions. The plausibility of Neiman's retaliation claim is undermined by allegations which she includes that could only call for a jury to speculate and fall far short of meeting her burden to come forward with admissible, relevant evidence creating a genuine dispute.  Nevertheless, the Court will address these arguments to the extent possible.

Neiman makes a number of additional claims regarding Kaleal.  Plaintiff maintains that Kaleal remained loyal to Reid, who permitted Kaleal to overstep the chain of command. (Plaintiff's Brief at 18).  In addition, Neiman asserts that Kaleal "had a clear animus" toward her,

wanted her job, and was given her job duties. (*Id.* at 12, 19).  Plaintiff also alleges that Kaleal played a direct role in her termination and questions whether Kaleal would be considered a supervisor, given that Kaleal allegedly controlled Sheriff Reid's ear and the fiscal office after Neiman took leave. (*Id.* at 18).

Significantly, Neiman has not demonstrated that any of Kaleal's actions were motivated by, or at all connected to, Neiman's participation in the BCI investigation. As a result, the various arguments that Plaintiff makes regarding Kaleal do not further her claim that she was terminated in retaliation for her meetings with BCI.  In regard to Kaleal performing Neiman's job duties, Neiman was the top fiscal officer for the sheriff's office and was out on leave during November and December 2009, returning to a part-time schedule in January 2010.  She was absent for leave again in April 2010.  Given the duration of Plaintiff's absence, it is not surprising that a replacement would have been selected.  Illustrative of Plaintiff's reliance upon supposition rather than credible evidence is her assertion that "Kaleal, who reported—against the chain of command, directly to Reid—took over Neiman's duties almost *in toto*; quite possibly, a juror might think, because she was working with Reid to 'get' Neiman." (Plaintiff's Brief at 19).  Yet, it is uncontroverted that the opportunity to fill in for Neiman was first offered to Neiman's most senior subordinate, McKinnon, who declined, leaving the position to Kaleal. (Kaleal Dep. at 17:20-25).  Based on the circumstances, a jury could not conclude that Kaleal's substitution demonstrates that Reid acted with a retaliatory motive or engaged in some type of conspiracy with Kaleal.

Plaintiff sets out a number of additional conclusory allegations for which she provides inadequate evidentiary support or analysis. (Plaintiff's Brief at 19).  For instance, Plaintiff alleges that Defendant Reid had several altercations with BCI agents, but fails to identify where

this is supported in the record.  A jury could not conclude that Reid's exchange with agent Clar about the appraisers rose to the level of an altercation.  She further alleges that her status as a "classified employee" was unknown because Reid had not changed her job description but buried her in fiscal work after firing a number of other employees, and Defendant Reid terminated her weeks after her return from FMLA leave. (*Id.*).  These two arguments are not cogent, leaving the Court unable to ascertain how they bear on causation.

At this stage, Plaintiff carries the burden to come forward with admissible evidence from which a jury could conclude that her participation in the BCI investigation was a motivating factor in Reid's decision to terminate her.  Neiman has not identified sufficient evidence to support her subjective belief that she was retaliated against in response to her speech. *See Harris v. Butler Cnty., Ohio ex rel. its Sheriff's Dep't*, 344 F. App'x 195, 200 (6th Cir. 2009) (plaintiff's belief that he was terminated for political reasons was insufficient to demonstrate causal connection required for a claim of retaliation) *(citing Coffey v. Chattanooga-Hamilton County Hosp. Auth.*, No. 98-6230, 1999 WL 824870, at *4 (6th Cir. Oct. 6, 1999)) (finding that "rumors, conclusory allegations and subjective beliefs" are insufficient to defeat a motion for summary judgment)).  Accordingly, Plaintiff has failed to establish a *prima facie* case of retaliation.

### 3. Whether Defendants Would Have Made the Same Decision as to Plaintiff's Employment Absent Protected Conduct

Even if Neiman could establish a *prima facie* case of retaliation, she would be unable to survive the burden shifting portion of the analysis.  "If the plaintiff meets her burden, the burden then shifts to the defendants to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 431 (6th Cir. 2000).  Defendants come forward with reasons showing

Neiman's termination would have occurred independent of her exercise of any alleged First Amendment rights.

Defendants' decision to terminate was grounded on Plaintiff's unprofessionalism, which interfered with the efficient operation of the sheriff's office. (Reid Dec. at ¶ 8).  During his tenure, Sheriff Reid received complaints, from various sources, concerning Plaintiff's attitude toward those who did business with the Sheriff's office and her subordinates. (*Id.*). Three individuals from entities outside of the sheriff's department reported that Neiman had been disrespectful, argumentative, or uncooperative in their dealings. (Reid Memo at 2; Reid Dec. Exhibits B at 1 and Exhibit G at 10-11, 14-15, 17-18, 21, 31).  Neiman's manner was so unprofessional that it spurred demands to work through other sheriff's department employees. For instance, a dentist's office manager explained that Neiman had been "deliberately antagonistic and argumentative," and refused to work with the sheriff's office if required to work with Neiman. (Reid Dec. Exhibit B at 1).  Similarly, Neiman's subordinates provided examples of her rude demeanor when working with outside contractors, vendors, and employees from other agencies. (Reid Dec. Exhibits C, E, and F).  Her subordinates further explained that Neiman's hostility hindered productivity or caused anxiety. (*Id.*).  The complaints Reid received reinforced one another, providing consistent themes regarding Neiman's poor workplace attitude. Aside making from an incorrect statement that all accusations regarding her behavior arose from Kaleal, Plaintiff does not address these complaints from her subordinates or outside vendors.

Moreover, the investigative report compiled by the county's Office of Human Resources, an entity independent of the sheriff's office, lays out a predicate for Plaintiff's termination. Following interviews and a review of relevant documents, human resources concluded that Neiman had various disciplinary issues, including a pattern of unprofessional behavior toward

subordinate employees and entities outside of the sheriff's office. (Human Resources Report at 16-22).  The investigation also confirmed Kaleal's allegations that Neiman erred in her management of BPV grant accounts and a transportation account. (*Id.*). The disciplinary hearing report largely comes to the same conclusions as to the conduct and performance issues identified by human resources. (Disciplinary Hearing Report at 9-15).

Plaintiff argues that any errors related to the BPV and transportation accounts were harmless, not due to fault on her part, or that "documents clearly show" she acted properly with regard to the BPV grants. (Plaintiff's Brief at 9-10).  Plaintiff makes no effort to explain how documentation demonstrates that the findings from the human resources investigation and disciplinary hearing report with regard to the transportation and BPV accounts were incorrect. Neiman supports this argument only with conclusory statements from her declaration. (Neiman Dec. at ¶ 58-65).  As it must do with any evidence presented to defeat a summary judgment motion, the Court must determine whether a non-movant's testimony "is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.  Both the human resources' investigation and the subsequent hearing report concluded that Plaintiff had erred with regard to the transportation funds and the BPV accounts after a review of Kaleal's allegations, interviews, and relevant documents.   In light of this evidence, Plaintiff's conclusory, and otherwise unsupported, statements are insufficient to create an issue material of fact.

At this juncture, even accepting Plaintiff's challenging the merit of the conclusion that a basis for termination could include fiscal errors, the human resources and pre-disciplinary hearing reports' findings regarding Plaintiff's abusive behavior towards others in the workplace

provide a sufficient basis to conclude she would have been terminated for her non-protected conduct.   As the report from Plaintiff's hearing explains:

> A review of the all of the evidence presented . . . leads to the inescapable conclusion that there have been numerous and repeated occasions wherein [Neiman] became involved in verbal altercations with individuals from outside the Sheriff's Office and had on-going issues with the employees in the Fiscal office. The Sheriff's memo outlines the concerns that have been raised over a significant period of time and his attempts to address the issues, including several meetings with [Neiman]. . . . There are too many similar incidents involving unrelated individuals over a period of time to find [Neiman's] denial of such behavior, or her attempt to attribute it to the other party, credible or persuasive.

(Reid Dec. Exhibit G at 15). Beyond conclusory allegations, Plaintiff does not refute that Reid received multiple complaints over a period of months regarding her poor behavior toward others.

Finally, Reid warned Neiman on various occasions that she needed to adjust her approach in the workplace.  As early as July of 2009, nearly a year prior to her termination, Reid instructed Plaintiff to adopt a more professional and team-oriented demeanor. (Reid Memo at 1-2).  A few months later, Reid requested that Neiman attend anger management classes, a signal that Neiman still needed to improve. (Neiman Dec. at ¶ 43).  Prior to Plaintiff's termination, Reid provided a pre-disciplinary hearing for Neiman to respond to allegations of misconduct during which Neiman was represented by counsel.  Plaintiff does not deny that she was advised to modify her behavior.

Based on the above, Defendants have shown a legitimate, non-retaliatory business motive for Neiman's discharge.  Plaintiff has failed to establish that her employment was terminated for an unlawful reason.  Therefore, Defendants are entitled to summary judgment in their favor on Plaintiff's First Amendment retaliation claim.

### D.  Qualified immunity

In a separate motion for summary judgment, Defendant Reid argues that he is entitled to qualified immunity as to the First Amendment claim asserted against him in his individual capacity. (Doc. 47).  Plaintiff has not filed an opposition.

A fairly unusual situation presents itself where the nonmoving party does not respond to the motion for summary judgment.  While the Court generally is free to sustain unopposed motions, this empowerment does not extend to motions for summary judgment. *Rance v. Datavantage, Corp.*, 2008 WL 1899986, at *3 (N.D. Ohio April 28, 2008).  The "district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded.  The Court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged his initial burden." *Stough v. Mayville Community Schools*, 138 F.3d 612, 614 (6th Cir. 1998) (*quoting Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)); *see also Sutton v. United States*, 1991 WL 590, at *2, n. 1 (6th Cir. 1991) ("Rule 56 requires a court, even where a motion for summary judgment is unopposed, to determine that the moving party has established a right to relief as a matter of law and that no genuine issue of material fact exists before the court can award summary judgment.").

The qualified immunity doctrine "operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  A government official who is performing a discretionary function is entitled to qualified immunity from suit as long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999).

The defendant bears the initial burden of coming forward with facts which suggest that he was acting within the scope of his discretionary authority at the time in question. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).  Here, Defendant Reid has met his initial burden: it is uncontested that he was acting in his official capacity when he terminated Neiman's employment.

The burden of proof then shifts to the plaintiff, who ultimately must establish that a defendant is not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).  The plaintiff must show that (1) the facts alleged or shown make out a violation of a constitutional right, and (2) the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Lower courts have the discretion to decide which of the two prongs of the qualified immunity analysis to address first. *Pearson*, 555 U.S. at 236.

As previously explained herein, the Court has not found a constitutional violation. Therefore, Plaintiff has not met her burden as to the first prong of the qualified immunity analysis, entitling Reid to protection.

## IV.     CONCLUSION

For the foregoing reasons, the undersigned GRANTS Defendants' motion to strike (Doc. No. 43), Defendants' joint motion for summary judgment (Doc. No. 25), and Defendant Reid's motion for summary judgment. (Doc. No. 47).

/s Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  March 31, 2015.